ROMEIN v GENERAL MOTORS CORPORATION

GONZALEZ v FORD MOTOR COMPANY

Docket Nos. 83830, 83831. Argued October 5, 1989 (Calendar No. 7).
    Decided September 28, 1990. Rehearing denied 437 Mich 1202.

Evert Romein was injured in the course of his employment with
    General Motors Corporation before 1981. On September 28,
    1983, General Motors began coördinating benefits pursuant to
    the provision of 1981 PA 203, § 354, effective March 31, 1982,
    that permitted deduction of employer-financed pension and
    social security benefits from workers' compensation benefits
    received by a disabled employee. A hearing referee held that
    § 354 could not be applied retroactively. The Workers' Compen-
    sation Appeal Board reversed, finding that *Chambers v General
    Motors Corp,* 422 Mich 636 (1985), requires retroactive applica-
    tion. The Court of Appeals, SHEPHERD, P.J., and WAHLS and
    G. B. FORD, JJ., reversed (Docket No. 101298). The defendant
    appeals.

Arthuro Gonzalez was disabled prior to March 31, 1982, in the
    course of his employment with the Ford Motor Company.
    Workers' compensation benefits were awarded pursuant to a
    voluntary agreement. After March 31, 1982, Ford began to
    coördinate benefits. A hearing referee held that § 354 did not
    apply retrospectively because the injury occurred prior to the
    effective date of the act. The Workers' Compensation Appeal
    Board affirmed on the basis of 1987 PA 28 which declared that
    *Chambers* was erroneously decided. The Court of Appeals,
    SHEPHERD, P.J., and WAHLS and G. B. FORD, JJ., affirmed
    (Docket No. 101510). The defendant appeals.

In an opinion by Justice CAVANAGH, joined by Justices LEVIN,
    BOYLE, and ARCHER, the Supreme Court *held:*

The amendment of the workers' compensation act by 1987
    PA 28, § 354(17)-(20), which prohibits the coördination of work-
    ers' compensation benefits for employees who were injured

REFERENCES

Am Jur 2d, Workmen's Compensation §§ 7, 8.
See the Index to Annotations under Due Process; Impairment of
    Contract; Separation of Powers; Vested Rights; Workers' Compen-
    sation.

before the effective date of 1981 PA 203, § 354, does not violate the Due Process Clauses of the federal and state constitutions, the Contract Clause of the federal constitution, or the Separation of Powers Clause of the Michigan Constitution. The amendment was a constitutional exercise of legislative power retroactively modifying benefit levels for a legitimate purpose furthered by rational means. The statute does not abrogate any vested rights of the employers and validly may be applied to all compensation liabilities within its terms except those reduced to a final judgment before its effective date.

1. A rational basis standard of review governs the scrutiny of the legitimacy of social and economic legislation. A retroactive workers' compensation statute will not be deemed unconstitutional simply because it imposes a new duty or liability on the basis of past acts. All workers' compensation benefits and liabilities are statutory in origin and may be revoked or modified at the will of the Legislature. Thus, 1987 PA 28 is constitutional even though it applies to benefits due and payable for a period prior to the date of the statute. Only judgments entered under former law are immune from legislative modification.

2. 1987 PA 28 serves a legitimate state interest and employs reasonable means sufficient to survive a Contract Clause challenge. The level of benefits existing at the time of an injury does not constitute a legitimate contractual expectation protected by the Contract Clause. While the Contract Clause prohibits any state law from impairing the obligations of a contract, the prohibition must be accommodated to the state's inherent police power. The test for this accommodation involves determining whether the state law substantially impaired a contractual relationship, whether there is a legitimate public purpose for the law, and whether the means chosen to implement it are reasonable. In this case, the impairment is not substantial. The workers' compensation act substitutes a remedial scheme of compensation for injuries otherwise subject to recovery in tort for negligent acts of employers in the workplace. Employers benefit from the limit placed on their liability; the impairment at issue does not alter this benefit. The act regulates a field of commerce that has been subject to wide-ranging government regulation; the employers knew their rights were subject to alteration. There is a significant state interest in protecting the rights of disabled employees to receive compensation in return for relinquishment of their tort claims. The means chosen by the Legislature are reasonable.

3. The amendment does not violate the Separation of Powers Clause of the Michigan Constitution. The operative provisions

of the statute do not encroach upon the sphere of the judiciary. Rather, they merely repeal the act construed in *Chambers v General Motors Corp.* The enactment is a valid exercise of the Legislature's authority to retroactively amend legislation perceived to have been misconstrued by the judiciary. Such retroactive amendments based on prior judicial decisions are constitutional if the statute comports with the requirements of the Contract and Due Process Clauses of the federal and state constitutions, and as long as the retroactive provisions of the statute do not impair final judgments.

Justice BRICKLEY, concurring, expressed dissatisfaction with respect to the current state of constitutional law regarding retroactive civil legislation. Applicable precedent does not prohibit the Legislature from redefining rights and liabilities enjoyed and owing in the past, notwithstanding the delineation of those rights and liabilities by a prior Legislature. The appellants' due process claims, therefore, are not viable under current law.

Affirmed.

Chief Justice RILEY, dissenting, stated that in interpreting 1987 PA 28 the intent of the Legislature that enacted 1981 PA 203, the Legislature of 1987 invaded the constitutional authority granted to the judicial branch and usurped the judicial function of determining the proper construction of a statute. It is within the power of the Supreme Court, not the Legislature, to interpret the legislative intent of 1981 PA 203. Therefore, 1987 PA 28, § 354(17)-(20), violates Const 1963, art 3, § 2 and art 6, § 1 and should be applied prospectively from its effective date, May 14, 1987.

The declaration made by the 1987 Legislature in 1987 PA 28, § 354(17) that it was providing the legislative intent of the 1981 Legislature is contrary to prior Michigan case law. Additionally, it is not supported by the economic, political, and legislative history behind the enactment of each amendment at issue in these cases. The interpretation of § 354 imputed to the 1981 Legislature by the 1987 Legislature was erroneous. The 1981 Legislature was fully cognizant of the consequences of coördinating workers' compensation benefits, yet it enacted 1981 PA 203 in an attempt to stimulate a poor state economy by lowering the cost of doing business in Michigan. Furthermore, the claim of the 1987 Legislature that it provided the original intent of the 1981 Legislature flies in the face of the fact that those members of the 1981 Legislature who opposed 1981 PA 203 failed in their attempt to limit its application.

1987 PA 28 is not a remedial or curative amendment. The

function of curative legislation is to repair the consequences of legal accident or mistake. These cases involve just the opposite. 1981 PA 203 was enacted to eliminate receipt by injured workers of total benefits in excess of workers' compensation and thus reduce the cost of workers' compensation to businesses through coördination of benefits. In *Chambers,* the Supreme Court unanimously interpreted the statute to mean that employers have the right to coördinate benefit payments regardless of the date of injury. 1987 PA 28 was enacted to invalidate this decision, thus effecting a substantive change in the law. The word of the curing legislature should not be conclusive in determining what the prior representatives meant. The question of original intent is ultimately one for the reviewing court.

Applying both Michigan law and the rules of statutory construction in these cases leads to the conclusion that the coördination of benefits provisions that were interpreted by the Supreme Court in *Chambers* were not repealed. Rather, because they were reenacted by adopting the identical language from the original act, the coördination of benefits provisions have continued in force from the time of original enactment, March 31, 1982.

Justice GRIFFIN, dissenting, stated that 1987 PA 28 violates Michigan's constitutional requirement of separation of powers and contravenes the United States Constitution's Fourteenth Amendment guarantee of due process. It is fundamental that the Supreme Court, not the 1987 Legislature, is entrusted by the constitution with the power to determine the meaning of 1981 PA 203. The Legislature, by enacting 1987 PA 28, not only declared what the law shall be, a legislative function, but purported to declare what the law is, i.e., what the intent of a prior Legislature was, a judicial function. This declaration by the 1987 Legislature concerning the intent of the 1981 Legislature is a nullity.

Retroactive legislation has always been looked upon with disfavor. Even its constitutionality has been conditioned upon a rationality requirement beyond that applied to other legislation. The Supreme Court has never before recognized or sanctioned a legislative attempt to retroactively overrule one of its decisions, nor has the United States Supreme Court given consideration to the effect of retroactive legislation upon conduct occurring after judicial interpretation, but before the overruling legislation was enacted.

While the Legislature possesses the authority to enact workers' compensation laws that increase the burden on an employer for disability or expenses occurring or continuing after

the date of enactment of the amendatory statute, even though the accident which gave rise to the disability or expenses occurred prior to that time, past cases have limited the retroactive effect of such legislation by applying a change in benefit levels to those payments due after the effective date of an enactment. The appellants' reliance on the preëxisting state of the law should be considered in determining whether retroactive legislation is constitutional.

Because the Supreme Court never before recognized legislation purporting to retroactively overrule one of its decisions interpreting the enactment of a prior Legislature, it could hardly be said that the appellants were on notice that the law might be changed in such a manner. Where a person can prove detrimental reliance on the interim state of the law, it seems clear that there is entitlement to relief. In order to protect this Court's status as the final arbiter of what the law is, and to secure the guarantee of due process, the Legislature should not be permitted to undo retroactively past transactions completed in reliance upon a decision of this Court.

168 Mich App 444; 425 NW2d 174 (1988) affirmed.

WORKERS' COMPENSATION — COÖRDINATION OF BENEFITS — RETROACTIVE APPLICATION.

The amendment of the workers' compensation act by 1987 PA 28, § 354(17)-(20), which prohibits the coördination of workers' compensation benefits for employees who were injured before the effective date of 1981 PA 203, § 354, does not violate the Due Process Clauses of the federal and state constitutions, the Contract Clause of the federal constitution, or the Separation of Powers Clause of the Michigan Constitution; the amendment was a constitutional exercise of legislative power retroactively modifying benefit levels for a legitimate purpose furthered by rational means; the statute does not abrogate any vested rights of the employers and validly may be applied to all compensation liabilities within its terms except those reduced to a final judgment before its effective date (1987 PA 28, MCL 418.354[17]-[20]; MSA 17.237[354][17]-[20]; US Const, art I, § 10, Am XIV; Const 1963, art 1, §§ 10, 17, art 3, § 2, art 6, § 1).

*Levine, Benjamin, Tushman, Bratt, Jerris & Stein, P.C.* (by *Barrie R. Bratt* and *Charles P. Burbach*), for appellee Romein.

*James M. O'Reilly, P.C.* (by *James M. O'Reilly*), for appellee Gonzalez.

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs,* of counsel), for appellees Romein and Gonzalez.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Sterling W. Schrock* and *George H. Weller,* Assistant Attorneys General, for the intervenor-appellee.

*Bodman, Longley & Dahling* (by *Theodore Souris, Kim Michael Lavalle,* and *Martha B. Goodloe*) for the appellants (*John P. Raleigh* and *John G. Rahie,* of counsel), for General Motors Corporation; (*Douglas E. Cutler, Anthony P. Marchese, Jr.,* and *Alan S. Gorosh,* of counsel), for Ford Motor Company.

Amicus Curiae:

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry, M. Diane Vogt,* and *Rachelle G. Silberberg*) for Michigan Manufacturers Association.

CAVANAGH, J. We granted leave in these consolidated cases to decide the constitutionality of 1987 PA 28, § 354(17)-(20), MCL 418.354(17)-(20); MSA 17.237(354)(17)-(20). This statute prohibits the coördination of workers' compensation benefits for employees who were injured before the effective date of 1981 PA 203. It also requires the repayment plus interest of all benefits withheld as a result of coördinating benefits between 1982 and 1987 from disabled employees whose injury dates were before 1982. We hold that the amendments of the Workers' Disability Compensation Act contained in 1987 PA 28, § 354(17)-(20) are constitutional exercises of legislative power retroactively modifying benefit levels for a legitimate purpose furthered by ra-

tional means. We also hold that the statute does not abrogate any vested rights of the employers. The statute may validly be applied to all compensation liabilities within its terms except those which have been reduced to final judgment before its enactment.

## FACTS AND PROCEDURAL HISTORY

The plaintiffs were injured before 1981. In 1981, the Legislature enacted 1981 PA 203 which included the coördination of benefits provision of § 354, MCL 418.354; MSA 17.237(354). This section allowed coördination of workers' compensation benefits with employer-funded pension plan payments. This statute was part of a legislative reform package involving a series of related amendments of the workers' compensation statute. The coördination provisions were an essential component of a compromise plan that restructured benefits payable to disabled workers. The resources saved as a result of this coördination were reallocated by the statute to increase benefit levels generally, from two-thirds of the average weekly wage to eighty percent of after-tax wages, effective for injuries occurring after January 1, 1982.

The plaintiffs were subjected to these coördination provisions even though the statute was silent regarding its application to claims resulting from injuries occurring before its 1982 effective date. On September 28, 1983, General Motors Corporation informed plaintiff Romein that he had been overpaid $75.03 per week from January 1, 1982, because of the corporation's failure to coördinate benefits under 1981 PA 203, § 354, as of its effective date. Thus, the corporation began to deduct the amount of this "overpayment" of $3,913.57 from compensation benefits as they became due

and payable. The corporation also began coördinating future benefit payments by deducting pension and social security benefits from the workers' compensation payments due, resulting in a thirty-five percent reduction of benefits actually paid. This resulted in a reduction of $132 a week. His total benefits were reduced from $19,377.80 to $12,513.80 per year. Plaintiff Gonzalez experienced an even more dramatic reduction in his workers' compensation benefits. The Ford Motor Company informed Gonzalez that it would begin coördination of his benefits in accordance with § 354 resulting in the withholding of his *entire* $176 weekly payment beginning March 31, 1982.

Between January 1, 1982, and October 7, 1985, the legality of coördination of benefits for injuries which occurred before the effective date of 1981 PA 203, § 354, was in doubt. The Legislature expressed its view that the initial, lower court decisions[1] permitting application of § 354 coördination rights only to claims arising from injuries occurring after the effective date of § 354 were correct.[2]

The defendants' efforts to coördinate plaintiffs' benefits under § 354 received judicial acceptance in 1985 when this Court reversed the lower court in *Chambers v General Motors Corp,* 422 Mich 636; 375 NW2d 715 (1985). The Court applied principles of statutory interpretation to hold that § 354 permitted coördination of benefits regardless of the date of injury since the Legislature did not state an intent to apply the provision only to benefits

---

[1] See *Chambers v General Motors Corp,* 1982 WCABO 751, and *Franks v White Pine Copper Div,* 122 Mich App 177; 332 NW2d 447 (1982).

[2] The House and Senate both adopted legislative resolution in early 1982, purporting to interpret § 354 to prevent the coördination of benefits of persons injured before the effective date of § 354. These legislative resolutions, however, are not binding on this Court. *Chambers v General Motors,* 422 Mich 636, 659; 375 NW2d 715 (1985).

paid to employees whose injuries occurred after its effective date.

Thereafter, the Legislature enacted 1987 PA 28 which clearly indicated that the coördination of benefits provision of 1981 PA 203 was not intended to reduce benefits for injuries which occurred before the effective date of the 1981 statute. This statute retroactively amended § 354 and prevented any coördination of benefits for claims arising from injuries which occurred before March 31, 1982.

The first provision of 1987 PA 28 states that it is the Legislature's intent to prohibit the coördination of benefits for pre-March 31, 1982, injuries.[3] Another provision of the act requires that any setoffs which have been made by employers between March 31, 1982, and May 14, 1987, be refunded to employees, with interest. Thus, any benefits that were reduced under the coördination provisions of § 354, are deemed by statute to have been "underpayments" of workers' compensation benefits and must be refunded within sixty days with interest.[4] In addition, if the employee had

---

[3] Subsection 17 provides:

The decision of the Michigan Supreme Court in *Franks v White Pine Copper Division*, 422 Mich 636 (1985) is declared to have been erroneously rendered insofar as it interprets this section, it having been and being the legislative intention not to coordinate payments under this section resulting from liability pursuant to section 351, 361, or 835 for personal injuries occurring before March 31, 1982. It is the purpose of this amendatory act to so affirm. This remedial and curative amendment shall be liberally construed to effectuate this purpose.

[4] Subsection 19 provides:

Notwithstanding any other section of this act, any payments made to an employee resulting from liability pursuant to section 351, 361, or 835 for a personal injury occurring before March 31, 1982 that have been coordinated before the effective date of this subsection shall be considered to be an underpay-

repaid money to the employer for benefits received that the employer alleged should have been coördinated, 1987 PA 28 requires the employer to reimburse the employee, with interest, within sixty days.[5]

The issue before the Court is whether the Legislature has violated the defendants' constitutional rights under the Due Process or Contract Clauses of the state and federal constitutions by retroactively altering the level of benefits due and payable prior to the amendment. We must also decide whether this retroactive alteration of benefits violates the Separation of Powers and One Court of Justice Clauses of the Michigan Constitution.

I

The defendants contend that 1987 PA 28, § 354(17)-(20) violates the Due Process Clauses of the United States and Michigan Constitutions by retroactively imposing liability for additional workers' compensation benefits for past compensable periods. They contend that they relied on the coördination provisions of § 354 during the period between its effective date of March 31, 1982, and

ment of compensation benefits, and the amounts withheld pursuant to coordination shall be reimbursed with interest, within 60 days of the effective date of this subsection, to the employee by the employer or carrier.

[5] Subsection 20 provides:

Notwithstanding any other section of this act, any employee who has paid an employer or carrier money alleged by the employer or carrier to be owed the employer or carrier because that employee's benefits had not been coordinated under this section and whose date of personal injury was before March 31, 1982 shall be reimbursed with interest, within 60 days of the effective date of this subsection, that money by the employer or carrier.

the amendment date of May 14, 1987, and that this reliance gives them a vested right to have their liability for those periods determined by the law then in effect.

The defendants argue that 1987 PA 28 is "purely retroactive" and unconstitutionally impairs rights under executed contracts of employment.

The defendants urge that this statute is "purely retroactive" because it not only applies to injuries arising before the effective date of the act, but also modifies the employer's liability for a preenactment compensable period. Thus, this statute is different from the one upheld in *Chambers.*

We hold that the challenged statute satisfies the rational relationship test and does not abrogate any vested rights of the employers. The statute, therefore, does not violate the Due Process Clauses.

A

A rational basis standard of review governs this Court's scrutiny of the legitimacy of social and economic legislation.

> "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, e.g., *Ferguson v Skrupa,* 372 US 726 [83 S Ct 1028; 10 L Ed 2d 93] (1963); *Williamson v Lee Optical Co,* 348 US 483, 487-488 [75 S Ct 461; 99 L Ed 563] (1955)." [*Pension Benefit Guaranty Corp v R A Gray & Co,* 467 US 717, 729; 104 S Ct 2709; 81 L Ed 2d 601 (1984).]

The rational basis test has been applied to the

retroactive portions as well as to prospective portions of statutes modifying workers' compensation benefit levels. *Pension Benefit Guaranty Corp, supra.*

To apply a stricter standard of review to a workers' compensation statute simply because it operates *retroactively* would put the judiciary in the business of "allocat[ing] the interlocking economic rights and duties of employers and employees upon workmen's compensation principles" although this is a task within the province of the Legislature. *Usery v Turner Elkhorn Mining Co,* 428 US 1, 15; 96 S Ct 2882; 49 L Ed 2d 752 (1976), citing *New York Central R Co v White,* 243 US 188; 37 S Ct 247; 61 L Ed 667 (1917).

B

A workers' compensation statute will not be deemed unconstitutional simply because it imposes "a new duty or liability based on past acts," *Usery, supra* at 16. The *Usery* decision upheld the constitutionality of title IV of the Federal Coal Mine Health and Safety Act of 1969[6] against a Due Process Clause challenge by applying only minimal judicial scrutiny to its retroactive provisions. The statute retroactively imposed liability on employers for injuries which occurred years before its enactment. The law was retroactive in two respects. First, it altered the legal status of completed transactions by requiring the compensation of employees who left the industry before the effective date of the act. Second, it imposed liability on coal mine owners for injuries suffered before the date of the new statute.

The Court in *Usery, supra* at 16-17, cautioned that: "It does not follow, however, that what Con-

[6] See 30 USC 931-945.

gress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." The justification for retrospective legislation must take into account the possibilities that the parties acted in reliance on current law and that they may have altered their conduct to reduce liability if they had anticipated the imposition of later liability.[7] The coal mine operators could not have altered their conduct to avoid retroactive liabilities arising from injuries occurring before 1950 because at that time there was no understanding of the causal relation between the exposure to coal dust and black lung disease. Thus, the injuries arising before the enactment of the statute could not have been foreseen or avoided.[8]

It is similarly unlikely that the defendants in this case would have altered their course of conduct and paid full benefits merely to avoid the potential liability from a later change in the law. This is especially true since they would have been unlikely to recoup these amounts from the employees if the coördination provisions were later upheld for pre-1982 injuries.[9] The employers acted in their own best economic interests at the time.

As in *Usery,* where the employer was required

---

[7] The Court has examined an argument based on the likelihood of altering conduct to avoid future liability in *Welch v Henry,* 305 US 134; 59 S Ct 121; 83 L Ed 87 (1938). The Court upheld against due process attack a state statute enacted in 1935 which taxed 1933 dividend income previously exempted by the 1933 taxing statute. The Court held that the stockholder would have continued to receive corporate dividends even if he had known that the dividends would later be taxed.

[8] *Usery, supra* at 40, n 4 (Powell, J., concurring).

[9] As Justice BOYLE stated in *Chambers, supra* at 662: "[O]verpayments by an employer while waiting for the board to approve a setoff may be difficult or impossible to recover."

to pay benefits to former employers, the form of retroactive application at work here imposes liability for past, completed acts since the payments have already been made. These payments created an expectation in the employers that the payment periods were completed transactions. The employers in *Usery* also argued that the statute was purely retroactive in that it required payment to miners who left employment in the industry before the effective date of the act, i.e., past, completed transactions.

Admittedly, the employers in this case held an expectation that the payments were completed transactions. We do not accept, however, their contention that if parties have patterned their past conduct in reliance on past law, they have a vested right to have the legality of that conduct determined under law then in effect. The rational relationship test applies to economic legislation whether it is retroactive or not. The retroactive aspects of legislation must meet the test of due process, "[b]ut that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guaranty Corp, supra* at 730. The Court in *Usery* held that the retroactive portion of the statute was justified "as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Usery, supra* at 18.

The retroactive portions of the statute challenged here are justified by a rational legislative purpose to protect the benefit levels of workers who did not receive the increases in the legislative reform packages of 1980 and 1981. Since they did not receive the increase, remedial measures were

needed. These amendments served a rational legislative purpose to alleviate this hardship.

The United States Supreme Court has upheld retroactive liability even where the employers acted in reliance on existing law. In *Pension Benefit Guaranty Corp, supra* at 729, the Court upheld the retroactive application of the Multiemployer Pension Plan Amendments Act of 1980.[10] The statute modified the terms of a governmentally provided program of insurance designed to insure that the termination of a pension plan would not result in insufficient funds to pay employees their anticipated benefits. Employers paid premiums for the benefit of this government subsidized insurance program. The act imposed a new obligation on employers who terminated their plans to pay a proportionate share of the plan's "unfunded vested benefits." This new withdrawal liability was made retroactive for five months preceding the enactment of the amendments.[11]

The United States Court of Appeals for the Ninth Circuit found that the retroactive provisions of the act violated due process rights[12] because the employers had legitimately relied on existing law upon withdrawing from pension plans, but the United States Supreme Court reversed. The Court concluded that Congress could impose the act retroactively because the retroactive portion was a rational means to further a legitimate end, namely, "to prevent employers from avoiding the

---

[10] 29 USC 1381-1461.

[11] The retroactive provisions of the act resulted in the appellee in *Pension Benefit Guaranty Corp, supra,* having to pay a withdrawal liability of $201,359 that could neither have been foreseen nor avoided. *Id.* at 725. Prior to enactment, this employer would have been liable upon termination of the plan to pay only funded pension rights that had vested.

[12] See *Shelter Framing Corp v Pension Benefit Guaranty Corp,* 705 F2d 1502 (CA 9, 1983).

adverse consequences of [the newly enacted] withdrawal liability . . . ." *Id.* at 723.

The defendants seek to distinguish *Usery* and *Pension Benefit Guaranty Corp* by arguing that the retroactive provisions of 1987 PA 28 are materially different from the workers' compensation and pension liabilities imposed by the statutes addressed in those two cases. The defendants argue that the statute in *Usery* only prospectively mandated the payment of new compensation obligations and so did not impose new liabilities for past compensable periods as does 1987 PA 28. But as to those miners in *Usery* who had left employment in the industry before the effective date of the act, the liability for past, completed transactions was altered. Additionally, the form of retroactivity does not alter the relevant test for assessing a due process violation. The payments at issue here are "purely retroactive" in that they apply to payments for past injury *and* they apply to payments that were already paid for past compensable periods. We cannot say, however, that the form chosen by the Legislature was arbitrary or unreasonable.

To determine if the retroactivity is arbitrary or unreasonable, the party's reliance on the preëxisting state of the law should be considered.[13] Thus, we must address the extent of the defendants' justifiable reliance on the coördination provisions of the prior statute repealed by 1987 PA 28.

We are not persuaded that the defendants' reliance on the coördination provisions was reasonable.

The defendants cannot claim a reliance interest on rights created by the workers' compensation

---

[13] See *Brennan v Kirby,* 529 A2d 633, 640 (RI, 1987), citing Hochman, *The Supreme Court and the constitutionality of retroactive legislation,* 73 Harv L R 692, 727 (1960).

statute that are more deserving of constitutional protection than the reliance interest of the employers who incurred retroactive liabilities under the pension law upheld in *Pension Benefit Guaranty Corp, supra* at 727. In both instances, the employers were on notice of the legislative debate regarding the proposed changes in the law. Reliance on an area of law that is in a state of flux is not reasonable reliance.

There are no vested rights in the amount of liability established at the time of an injury. The Legislature possesses the authority to enact workers' compensation laws that " 'increase the burden on the employer for disability or expenses occurring or continuing after the date of enactment of the amendatory statute, even though the accident which gave rise to the disability or expenses had occurred prior to that time.' " *Lahti v Fosterling,* 357 Mich 578, 592; 99 NW2d 490 (1959), citing *Hogan v Lawlor & Cavanaugh Co,* 286 AD 600; 146 NYS2d 119 (1955).[14]

This Court has held that a remedial statute which acts retroactively does not violate due process so long as it does not impair vested rights.[15] The statute challenged here does not violate this principle for several reasons. First, from the context in which the statute was passed, it is clear that the Legislature was modifying the coördination of benefits provision to cure a perceived defect resulting from the interpretation of the prior law

[14] We do not address in this opinion the constitutionality of a retroactive statutory *reduction* in workers' compensation benefit levels.

[15] In *Karl v Bryant Air Conditioning Co,* 416 Mich 558; 331 NW2d 456 (1982), the Court held that the newly enacted statute adopting comparative negligence could be applied to a products liability action even though the action was brought before the adoption of comparative negligence; the retroactivity did not violate due process because it did not take away any vested rights. See also *Hansen-Snyder Co v General Motors Corp,* 371 Mich 480; 124 NW2d 286 (1963).

in *Chambers, supra.* Therefore, the amendment is remedial.

Second, the defendants have no vested rights in the finality of the coördinated benefits paid. The retroactive liability imposed by 1987 PA 28 does not abrogate a vested or contractual right of the employers since workers' compensation benefits and liabilities are statutory in origin and may be revoked or modified at the will of the Legislature. See *Lahti, supra* at 589. The United States Supreme Court has held that an employer's interest in the rate of compensation is not a right that is absolutely vested for purposes of the Due Process Clause:

> [Certain] vested economic rights are held subject to the Government's substantial power to regulate for the public good the conditions under which business is carried out and to redistribute the benefits and burdens of economic life.[16]

Finally, the 1987 amendment only modifies the source of funds from which an employer may satisfy a workers' compensation award. The entitlement to benefits was established before the enactment of the original coördination of benefits statute. The amendment does not create a new *entitlement* conferring a disability status not provided under prior law. In *White v General Motors Corp,* 431 Mich 387, 395-396, n 7; 429 NW2d 576 (1988), this Court recognized that the retroactive increase of the amount of benefits owing to a disabled employee differs qualitatively from a statute altering the terms of a claimant's eligibility for benefits. Thus, the defendant's assertion that the *amount* of benefits specified by statute is a

---

[16] *United States v Locke,* 471 US 84, 105; 105 S Ct 1785; 85 L Ed 2d 64 (1985), citing, inter alia, *Usery, supra.*

vested right and cannot be retroactively modified is unsupported by case law.

We hold, therefore, that 1987 PA 28 is constitutional even though it applies to benefits due and payable for a period before the effective date of the statute. We hold further that only judgments entered under former law are immune from this legislative modification. This limitation protects the vested rights that form in reliance on an award at the moment it is reduced to a final judgment.

II

Having found no violation of the Due Process Clauses, we must now decide if 1987 PA 28 violates the Contract Clause, US Const, art I, § 10. The defendants contend that the retroactive provisions violate the Contract Clause because they revive liabilities of employers that were fully discharged by completed transactions in reliance on state law. We hold that the contention lacks merit primarily because the expectation at issue here is not protected by the Contract Clause.

Further, even if the benefit levels were construed as a contractual right, the law serves a significant and legitimate public purpose and it employs reasonable means sufficient to survive a Contract Clause challenge.

A

The defendants cannot rely on the level of benefits existing at the time of an injury as a legitimate contractual expectation protected by the Contract Clause. *Lahti, supra* at 590-592.

Additionally, in *Chambers,* this Court reiterated the established principle that benefits and liabili-

ties in the workers' compensation statute do not
create rights protected by the Contract Clause.
*Chambers, supra* at 654, citing *Shavers v Attorney
General,* 402 Mich 554; 267 NW2d 72 (1978), and
*Lahti, supra* at 591-592.

B

Even though we hold that the Contract Clause
does not apply to the benefits at issue here, the
retroactive provisions would survive a Contract
Clause challenge. While the Contract Clause pro-
hibits any state law from impairing the obligations
of contract, this prohibition must be "accommo-
dated to the inherent police power of the State 'to
safeguard the vital interests of its people.'" *En-
ergy Reserves Group, Inc v Kansas Power & Light
Co,* 459 US 400, 410; 103 S Ct 697; 74 L Ed 2d 569
(1983). The prohibition, therefore, is not absolute.
To test for the valid accommodation of the Con-
tract Clause and the state's police power, the
United States Supreme Court has established a
three-pronged test. The first prong is to determine
"whether the state law has, in fact, operated as a
substantial impairment of a contractual relation-
ship." *Allied Structural Steel Co v Spannaus,* 438
US 234, 244; 98 S Ct 2716; 57 L Ed 2d 727 (1978).
   The impairment in this case cannot be deemed a
substantial one. The workers' compensation stat-
ute substitutes a remedial scheme of compensation
for injuries otherwise subject to recovery in tort
actions for the negligent acts of employers in the
workplace. The employers benefit from this
scheme by obtaining a definite limit on their liabil-
ity for workplace injuries. Since the impairment
complained of in this case does not alter this basic
benefit to the employer, it cannot be said to be
substantial.
   One factor in determining the extent of the
impairment is the degree of regulation in the

industry the complaining party has entered.[17] The party to a contract who has entered into a highly regulated industry may not remove their contract from state restrictions merely by making a contract purportedly immune from legal limitation. *Energy Reserves Group Inc, supra* at 411, citing *Hudson Co Water Co v McCarter,* 209 US 349, 357; 28 S Ct 529; 52 L Ed 828 (1908). The workers' compensation statute regulates a field of commerce that has been subject to a wide-ranging and comprehensive scheme of government regulation. In this scheme the parties occupy a status that subjects them to certain retroactively imposed rights and liabilities. *Lahti.* The defendants knew that their rights were subject to alteration. In addition, the legislative resolution in early 1982 purporting to interpret § 354 put the defendants on notice that the Legislature might seek to prevent the coördination of benefits for pre-1982 injuries if efforts to achieve this result failed in the courts. Since the employer was aware of the likely alteration of the coördination of benefits provision, the impairment cannot be deemed substantial.

To the extent, if any, that contractual interests are impaired, the second prong of the Contract Clause test requires that there be a legitimate public purpose for the regulation. This requirement guarantees that rather than merely providing a benefit to special interests, the state is validly exercising its police power. There is a significant state interest in protecting the right of disabled employees to receive the full compensation intended by the Legislature in return for the relinquishment of their tort claim.

---

[17] *Energy Reserves Group, Inc, supra,* citing *Spannaus, supra* at 242, n 13, citing *Veix v Sixth Ward Bldg & Loan Ass'n of Newark,* 310 US 32, 38; 60 S Ct 792; 84 L Ed 1061 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

It is significant that in the 1981 amendment, the resources saved as a result of coördination of benefits were reallocated to increase benefit levels generally. These increased levels, however, were only for injuries after January 1, 1982. The Legislature could have reasonably found that the coördination of benefits caused hardship among the employees whose injury dates were before 1982 since these employees were not entitled to the overall increase of benefits provided for those injured after 1982. There was a legitimate state interest, therefore, in correcting this perceived inequity.

The final prong of the Contract Clause test examines the means by which the contracting parties' rights and responsibilities are adjusted. The means chosen here are reasonable in the light of deference given to legislative action. "As is customary in reviewing economic and social regulation . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *United States Trust Co v New Jersey,* 431 US 1, 22-23; 97 S Ct 1505; 52 L Ed 2d 92 (1977). The means are also reasonable since the statute imposes no more retroactive liability than is necessary to remedy an unexpected circumstance relating to the interpretation of a prior statute. The judicial interpretation that allowed for the setoff was deemed to be incorrect and the setoff must be returned, not an unreasonable solution.

We find that 1987 PA 28 serves a legitimate state interest in protecting the benefits of disabled employees through reasonable means sufficient to survive a Contract Clause challenge.

III

Turning to the Separation of Powers and One

Court of Justice argument, we do not read the provisions of 1987 PA 28, § 354(17)-(20), as violating either art 3, § 2 or art 6, § 1 of the Michigan Constitution. The operative provisions of the statute do not encroach upon the sphere of the judiciary. Rather, they merely repeal the act that *Chambers* construed. That prior statute is superseded by 1987 PA 28 and the amendatory act expressly indicates that it is to be applied retroactively. This enactment is a valid exercise of the Legislature's authority to retroactively amend legislation perceived to have been misconstrued by the judiciary. Such retroactive amendments based on prior judicial decisions are constitutional if the statute comports with the requirements of the Contract and Due Process Clauses of the federal and state constitutions, and so long as the retroactive provisions of the statute do not impair final judgments.

Numerous courts have recognized that the Legislature may cure the judicial misinterpretation of a statute. For instance, the federal courts have upheld statutes that retroactively abrogate statutory rights, at least where the repealing statute does not impair final judgments.[18] In *Seese v Bethlehem Steel Co,* 168 F2d 58, 62 (CA 4, 1948), the court reasoned that the Legislature's enactment of a retroactive statute repealing *the effects of a prior judicial decision* is not an exercise of judicial power:

> When the Fair Labor Standards Act was interpreted by the Supreme Court as requiring computation in the work week of time consumed in walking to work and other preliminary activities,

---

[18] See, e.g., *Long Island Oil Products Co, Inc v Local 553 Pension Fund,* 775 F2d 24, 30 (CA 2, 1985).

this was just as though the original act contained express provision to that effect; and, when Congress passed the sections of the statute here under consideration, the effect was to repeal the original statute to the extent of that coverage and deny to the federal courts jurisdiction to entertain a suit based thereon. This does not in any manner affect adjudications already made, nor does it attempt to direct the courts in the exercise of judicial power. All that it does is to define rights, i.e., to amend or limit the effect of a prior statute so as to take away a cause of action given by it.[19]

Similarly, in *Long v United States Internal Revenue Service,* 742 F2d 1173 (CA 9, 1984), subsequent proceedings vacated on other grounds 487 US 1201; 108 S Ct 2839; 101 L Ed 2d 878 (1988), the court upheld a statute that abolished the plaintiff's right to obtain disclosure of certain IRS data, although such disclosure rights had been created by a previous federal appellate decision interpreting a statutory exemption to the Freedom of Information Act. In upholding the Congressional repeal of this exemption against due process challenge, the Court articulated a principle that is useful in resolving the separation of power claim presented here:

> Courts have consistently upheld the retroactive application of "curative" legislation which corrects defects subsequently discovered in a statute and which restores what Congress had always believed the law to be. [*Id.* at 1183.]

Indeed, if the defendants' separation of powers claim had merit as applied to the curative statute challenged here, the power of the Legislature to enact curative and remedial legislation would be

---

[19] Accord *Battaglia v General Motors Corp,* 169 F2d 254, 261-262 (CA 2, 1948) ("[n]or is the Portal-to-Portal Act . . . an encroachment upon the separate power of the judiciary").

severely curtailed, even where the statute does not violate constitutional due process limits.[20] This would represent a judicial usurpation of what is properly a legislative function.[21]

Finally, we conclude that § 354, as originally enacted in 1982, gave employers the right to coördinate benefits when an employee received a duplicate recovery through the receipt of other employer-funded benefits. Thus, employers may have properly exercised this right by withholding compensation benefits due and payable between the date of decision of *Chambers* in 1985 and the repeal of these provisions in 1987. An employer's act of withholding benefits, however, does not have the status of a final judgment.[22]

### CONCLUSION

The employers' right to coördinate benefits as provided by statute in 1982 was repealed by 1987 PA 28 through a constitutional exercise of legisla-

[20] We are, however, troubled by the language of subsection 17 of 1987 PA 28. This provision contends that this Court's holding in *Franks,* n 3 *supra,* was erroneous. Even though the Legislature has authority to remedy the *effects* of this Court's decisions, and may do so by repealing statutes which those decisions interpret, the Legislature lacks the power to act as a supreme judicial body. But we need not address the defendants' separation of powers claim with respect to this particular provision. Even if we held that subsection 17 violated the Separation of Powers Clause of the Michigan Constitution, this holding would not affect the validity of subsections (18)-(20). These separate amendatory provisions express a legislative intent to retroactively prohibit the coördination of benefits authorized by the prior statute. These provisions wholly replace the former law. The legal effect of such a repealing statute that wholly supplants a former statute was addressed by this Court in *Lahti, supra* at 588. *Lahti* held:

" 'Where a section of a statute is amended, the original ceases to exist, and the section as amended supersedes it and becomes a part of the statute for all intents and purposes as if the amendments had always been there.' " [*Id.*]

[21] See, generally, Hochman, n 13 *supra* at 704.

[22] We do not address the question of how and to what extent the principles of finality are implicated.

tive authority to regulate social and economic life. We hold that 1987 PA 28 does not violate the Due Process Clauses of the state and federal constitutions, the Contract Clause of the federal constitution, or the Separation of Powers Clause of the Michigan Constitution, so long as it is not applied to impair coördination rights that were reduced to final judgment before its effective date.

Accordingly, we affirm the decision of the Court of Appeals.

LEVIN, BOYLE, and ARCHER, JJ., concurred with CAVANAGH, J.

BRICKLEY, J. (*concurring*).

## I. INTRODUCTION

Troubled though I am by the 1987 amendments at issue here, reaching back as they do to rewrite the past by altering the past consequences of past transactions, the lamentable failure of the United States Supreme Court to articulate any discernible limits on the constitutionality of retroactive civil, economic legislation forecloses the conclusion that the 1987 amendments violate the Due Process Clause of the Fourteenth Amendment. For this reason, I reluctantly concur with the majority.

The threat that retroactive legislation poses to our system of republican government should, in my judgment, be taken very seriously. The alarm has been sounded by Professor Julian N. Eule, in his recent article *Temporal limits on the legislative mandate: Entrenchment and retroactivity*, 1987 Am B Found Res J 379. I write separately primarily to amplify Professor Eule's message.

## II. THE ABSENCE OF MEANINGFUL CONSTITUTIONAL LIMITATIONS ON RETROACTIVE CIVIL LEGISLATION

### A

Regarding the current state of the law, Professor Eule neatly sums up the sad state of affairs as follows:

> Efforts to locate limits on retroactivity in the due process clauses of the fifth and fourteenth amendments, although once viewed as promising, seem to have fallen on hard times. The resurrection of the contract clause has not been paralleled under the due process provisions. The occasional noises emanating from the Court, designed to remind us that the route is not foreclosed, have a hollow ring to them. In *Usery v Turner Elkhorn Mining Co* [428 US 1; 96 S Ct 2882; 49 L Ed 2d 752 (1976)], for example, Justice Marshall, writing for the Court, concluded his recitation of the minimal scrutiny appropriate in reviewing economic legislation under the due process clause with the statement: "It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively." In the context of the entire opinion, which nevertheless upheld the retrospective application of federal mine health legislation, this language cannot be fairly read as proposing or applying a more stringent level of scrutiny for retroactive legislation. Minimal scrutiny is still very much the order of the day. Only the focus is adjusted slightly. Hence it is not the legislative selection of the means but its decision to apply the means retrospectively that must bear a "rational relationship" to whatever legitimate ends the Court conjures up. The slim possibility that a successful attack could ever be launched, given the size of this judicially constructed target, is rendered implausible by the strong presumption of constitutionality that economic and remedial social enactments are afforded, even when retroactive. In the determination of whether retrospective

economic legislation violates due process, the burden of proving irrationality thus rests squarely on the party asserting the violation. There's not much for a legislator to worry about here. [*Id.,* p 429. Citations omitted.]

<div style="text-align:center">**B**</div>

In my opinion, *Turner Elkhorn* and *Pension Benefit Guaranty Corp v R A Gray & Co,* 467 US 717; 104 S Ct 2709; 81 L Ed 2d 601 (1984), make clear that the legislation here under attack need only survive minimal, rational-basis scrutiny.[1] In addition, there are numerous cases from the federal courts of appeals supporting the majority's result. See, e.g., *Wiggins v Comm'r of Internal Revenue,* 904 F2d 311 (CA 5, 1990) (upholding the retroactive application to tax year 1983 of 1984 federal tax legislation, despite the appellant's reliance on the prior law); *Canisius College v United States,* 799 F2d 18 (CA 2, 1986), cert den 481 US 1014 (1987), *Temple Univ v United States,* 769 F2d 126 (CA 3, 1985), cert den 476 US 1182 (1986), and *New England Baptist Hosp v United States,* 807 F2d 280 (CA 1, 1986) (upholding, against a due process challenge, a retroactivity period of approximately four years); *Long Island Oil Products Co, Inc v Local 553 Pension Fund,* 775 F2d 24 (CA 2, 1985) (upholding a statute which reached back five years to undo a previously authorized six-month period of retroactivity); *United States v Northeastern Pharmaceutical & Chemical Co, Inc,* 810 F2d 726 (CA 8, 1986), cert den 484 US 848 (1987), *United States v Monsanto Co,* 858 F2d 160 (CA 4, 1988), cert den 490 US 1106 (1989), and *O'Neil v*

---

[1] The Contract Clause, as the majority observes, does not help the appellants, and potentially promising arguments based on the Taking Clause of the federal constitution and Const 1963, art 4, § 27 are not before us.

*Picillo,* 883 F2d 176 (CA 1, 1989), cert den 493 US — (1990) (upholding retroactive application of a federal environmental statute creating liability for past, improper disposal of hazardous waste); *Counsel v Dow,* 849 F2d 731 (CA 2, 1988), cert den 488 US 955 (1988) (upholding legislation retroactively authorizing attorney fees); and cases upholding the constitutionality of the Portal-to-Portal Act of 1947, 29 USC 251 *et seq.,* including *Battaglia v General Motors Corp,* 169 F2d 254 (CA 2, 1948), cert den 335 US 887 (1948), and *Seese v Bethlehem Steel Co,* 168 F2d 58 (CA 4, 1948) (upholding extensive retroactive nullification of a Supreme Court decision interpreting the Fair Labor Standards Act of 1938, 29 USC 201 *et seq.*).

III. TEMPORAL LIMITS ON THE LEGISLATIVE MANDATE

While Professor Eule's insights cannot be faithfully reproduced in a short space, the following excerpts may suffice to convey the gist of his thesis.

> The Framers were not blind to the citizenry's need for some security from the "fluctuating policy" of successive legislatures. It was to fulfill this need, said Madison, that the contract and ex post facto clauses were written into the Constitution. Conflicting lessons can be drawn from the inclusion of these restraints. They may alternatively be viewed as limited sanctuaries from the otherwise unfettered authority of legislatures to undo the policy judgments of their predecessors or as compelling evidence of the disfavored status of retrospective lawmaking. It is the choice between these competing visions—rather than the debate over natural law—that ultimately divided Justices Iredell and Chase in *Calder v Bull* [3 US (3 Dall) 386; 1 L Ed 648 (1798)]. Both agreed that the ex post facto clause could not, consistent with the histori-

cal meaning of that phrase, be applied to the civil
legislation before the Court. For Justice Iredell
this ended the constitutional inquiry since he be-
lieved that the legislature's power necessarily in-
cluded all that was not expressly denied to it.
Furthermore, in Iredell's eyes, the power to alter
preexisting legal understandings was essential, not
merely tolerable. He argued that if legislators
were denied the ability to subordinate private
rights to public exigencies, "the operations of Gov-
ernment would often be obstructed, and society
itself would be endangered." Iredell was not blind
to the possibilities for abuse, but he contended
that such risks had been undertaken willingly by
the people when they delegated authority to their
agents.

Justice Chase viewed the people's grant as more
restrained. Rejecting Iredell's assumption that
power not denied was conferred, Chase maintained
instead that power not conferred was denied. A
determination of what authority the people had
entrusted to their agents (through the federal or
state constitution) could not be made without an
understanding of the principles of a republican
form of government. Legislation inconsistent with
those principles should be viewed as beyond the
scope of the grant. The inapplicability of the ex
post facto clause did not foreclose the possibility
that the power exercised by the Connecticut legis-
lature was one that the people of Connecticut had
not conferred. It is common for scholars to charac-
terize Justice Chase's vision as limiting legislative
power by reliance on immutable natural rights.
This misses the point. Chase's thesis was not that
government *could not* be given the authority to act
retrospectively, but that the conferral of power to
act at odds with republican principles should not
be "presumed." For both Justices, therefore, the
issue was one of agency: Does the scope of author-
ity delegated by the people to their representatives
comprehend the power to legislate retroactively
where the exercise of such power is not expressly
forbidden?

\* \* \*

The voters do not delegate authority to rewrite history. Their earlier agents exercised legitimate authority when they enacted legislation. While such efforts may be repealed, this is not the same as retrospective eradication. A decision that bills defeated by prior legislatures can now be enacted and treated as if they *had* been enacted earlier arguably runs afoul of this same principle. The then-authorized representatives made a choice, and this decision demands recognition as the choice of the polity for that point in time. Each set of elected officials ought to be viewed as endowed by their sovereign with the mandate to make policy choices only within a bracketed temporal zone. Just as the delegation of authority does not encompass incursions into the domain of legisla- tures yet to come, it does not contemplate contravening the sanctity of time past.

While I contend that the prohibition against entrenchment and retroactivity are both products of the temporal boundaries the electorate affixes to its mandate, I do not pretend that these two borders are drawn to serve identical ends. I do believe they manifest a common interest in affording each generation of voters the opportunity to determine for itself, through its representatives, the rules that will govern its daily life. The two constraints, however, satisfy different—and at times conflicting—human needs. The postmandate restriction protects flexibility. It preserves the polity's right to change its mind. The premandate limitation, on the other hand, offers stability. It enables the polity to alter its direction, without unduly undermining the security we all find so necessary. This means that the choices of our representatives can be relied on for the temporal realm in which these agents legitimately exercised authority. No more is guaranteed, but no less is tolerable. [Eule, *supra,* pp 441-446. Emphasis in original.]

The Legislature in this case did not merely

change the future consequences of past acts, i.e.,
by changing the future benefit levels for persons
injured prior to 1982—a practice which the appel-
lants concede would be a constitutional way to
amend our workers' compensation scheme; rather,
the Legislature turns back the clock to redefine
rights and liabilities enjoyed and owing in the
past, notwithstanding the fact that those rights
and liabilities had already been determined by an
earlier and different body of agents of an earlier
majority, determinations which the Legislature in
1983, 1984, 1985 and 1986 declined to change. The
legislation in this case violates the temporal limits
of the 1987 Legislature. Because the United States
Supreme Court has given no indication that it
approves of Professor Eule's approach, however, I
must decline to dissent on these grounds from the
majority's finding that the 1987 amendments are
constitutional.[2]

### IV. ANALYSIS OF THE MAJORITY OPINION

For the most part, I concur with the analysis
adopted in the majority opinion. I, too, am trou-
bled by the Legislature's apparent attempt to in-
terpret a prior statute adopted by a prior Legisla-
ture. This is doubly distressing in light of our
intervening decision in *Franks v White Pine Cop-
per*, 422 Mich 636; 375 NW2d 715 (1985). Because
the Legislature may not interpret its own statute,
let alone that of a prior Legislature, I agree with
the majority that the 1987 legislation must be
viewed as a retroactive amendment rather than as
a "legislative interpretation" of an earlier statute.
This is the effect of the 1987 legislation, and

[2] While the appellants refer to Professor Eule's article, they do not
mount a "temporal mandate" attack on the 1987 amendments rooted
in the state constitution or in the Guaranty Clause of the federal
constitution.

courts, which must presume statutes to be constitutional, are required to look beyond form to the
substance of the challenged legislation.[3] As stated
earlier, I find no principled basis for concluding
that the 1987 amendments fail the rational basis
tests articulated by the United States Supreme
Court; since appellants have not offered a persuasive reason for giving a broader interpretation to
the Due Process Clause of the state constitution, I
agree that appellants' due process claims fail.[4]

I also agree with the majority that the appellants cannot show any sort of reliance on the prior
state of the law. I would not, however, go so far as
to hold the possibility of reasonable reliance foreclosed by the mere fact that the Legislature debated changing the law before doing so.

I do not agree with the majority's cursory discussion and conclusion, *ante,* pp 531-532, that the amendments in this case are "remedial." That term, in
my view, should be used with caution, lest every
amendment be deemed remedial. The majority has
not persuaded me that the amendments at issue in
this case should be so categorized.

Finally, I would not analyze appellants' Contract
Clause argument as if that clause applied in this
case. I therefore concur in the analysis and holding of § II(A), but not in those of § II(B).

In all other respects, I concur in the result and
analysis of the majority opinion.

RILEY, C.J. I respectfully dissent from the majority. In my opinion, the Legislature has invaded the

---

[3] Thus, if the provision declaring our decision in *Franks* erroneous
is struck from the 1987 amendments, we must nevertheless determine
whether the remainder may stand on its own terms. Since the
remaining provisions clearly operate retroactively, the relevant inquiry is whether they offend due process.

[4] In addition, no reasons are offered why the traditional rational
basis inquiry should not apply to the due process claim.

constitutional authority granted to the judicial branch and usurped the judicial function of determining the proper construction of a statute. It is within the power of this Court, not the Legislature, to interpret the legislative intent of 1981 PA 203. Therefore, I would conclude that 1987 PA 28, § 354(17)-(20), violates art 3, § 2 and art 6, § 1 of the Michigan Constitution of 1963. Accordingly, I would hold that 1987 PA 28, § 354(17)-(20) is to be applied prospectively from its effective date, May 14, 1987.

### I. HISTORICAL BACKGROUND

In 1987 PA 28, § 354(17), the Legislature stated:

> The decision of the Michigan Supreme Court in *Franks v White Pine Copper Division,* 422 Mich 636 [375 NW2d 715 (1985)] is declared to have been erroneously rendered insofar as it interprets this section, it having been and being the legislative intention not to coordinate payments under this section resulting from liability pursuant to section 351, 361, or 835 for personal injuries occurring before March 31, 1982. It is the purpose of this amendatory act to so affirm. This remedial and curative amendment shall be liberally construed to effectuate this purpose.

In *Presque Isle Twp Bd of Ed v Presque Isle Co Bd of Ed,* 364 Mich 605, 612; 111 NW2d 853 (1961), this Court held:

> "It is too elementary to justify us in referring to authority on the question, that a legislative body is not permitted under any circumstances to declare what its intention was on a former occasion so as to affect past transactions. . . . Its members have no more right to construe one of its enact-

ments retroactively than has any private individ-
ual."[1]

A review of the historical background that encom-
passed the enactment of 1981 PA 203 and 1987 PA
28 serves to illustrate the reasoning behind this
prohibition.

As outlined below, the interpretation of § 354
imputed to the 1981 Legislature by the 1987 Legis-
lature was erroneous. The 1981 Legislature was
fully cognizant of the consequences of coördinating
workers' compensation benefits, yet it enacted
1981 PA 203 in an attempt to stimulate a poor
state economy by lowering the cost of doing busi-
ness in Michigan.

### A. 1981 PA 203

1981 PA 203 was part of a comprehensive re-
form of the Workers' Disability Compensation Act
that was begun one year earlier.[2] The purpose of
the reform, and specifically 1981 PA 203, was to
reduce the cost to the business community of
workers' compensation liability and to eliminate
perceived abuses of the system. 1981 PA 203 was
passed in December, 1981. During the period prior
to the enactment of this legislation, Michigan had
been struggling through a severe recession. A
significant number of businesses either were clos-
ing their local operations or leaving the state. The
unemployment rate in Michigan during December
1981, was 14.4 percent,[3] and the 1981 inflation rate

---

[1] Quoting *Northern Trust Co v Snyder,* 113 Wis 516, 530; 89 NW
460; 90 Am St Rep 867 (1902).

[2] *Franks v White Pine Copper Div,* 422 Mich 636, 649-650; 375
NW2d 715 (1985).

[3] MESC Report No. 3221 (1981). Provided by the Business Research
Office, Michigan Department of Commerce.

for the City of Detroit in 1981 was 9.3 percent.[4] It was against this economic backdrop that the Legislature passed 1981 PA 203.[5]

As noted in *Chambers v General Motors Corp,* companion case of *Franks, supra* at 655, "Governor William Milliken discussed his proposals to solve what he deemed the 'biggest single liability to Michigan's job climate today [November 18, 1981]' ":[6]

> "To start with, we must keep in mind that the purpose of workers' compensation, after all, is to restore wage-earning capacity lost in on-the-job accidents. *Workers' compensation was never intended to be more lucrative than gainful employment* or to be a retirement bonus.
>
> "I have proposed that we coordinate benefits from different employer-paid sources so that workers receive the maximum benefits to which they are entitled, but no more. *It is only simple justice that an employer not be assessed costs for several different funds which result in reimbursing the injured worker for more than the lost wage-earning capacity.*"[7] [Emphasis added.]

The Governor's concerns were echoed in the Senate Analysis Section, SB 573: First Analysis, p 6 (January 7, 1982):

> By coordinating workers' compensation benefits with Social Security and other benefits, *Senate Bill*

[4] Consumer Price Index for the City of Detroit. Provided by the Business Research Office, Michigan Department of Commerce. Note, the Bureau of Labor Statistics computes the inflation rate only for major metropolitan cities. Detroit is the only city in Michigan for which the inflation rate is computed.

[5] The Senate passed the act by a vote of 26 yeas to 12 nays, SB 595, 1981 Senate Journal 2607. The House passed the act by a vote of 62 yeas to 43 nays, 1981 House Journal 2854.

[6] Remarks by Governor William G. Milliken to the Ann Arbor Chamber of Commerce on November 18, 1981.

[7] *Id.*

*595 [1981 PA 203] would provide a major savings to employers in the cost of workers' compensation while maintaining adequate benefit levels for disabled workers.* [Emphasis added.]

\* \* \*

Since 1912, other public and private wage replacement insurance programs have appeared with the result that many employees now receive wage-loss benefits from two, three, or four different programs providing a total wage "replacement" greater than the wages the employee earned while on the job, *while employers who must contribute to these programs find themselves paying more than once to replace the wages of a single employee.* [Emphasis added.]

After SB 595 passed the House vote, five members of the House reserved the right to enter their protests against the passage of the bill. Rep. Cushingberry said:

This measure, while I'm sure will be reported as a major cost savings measure for business; it will prove to produce its benefit. The only thing this bill will do is to perhaps increase the burden on those less fortunate. . . . This outcome of our act tonight effectively cuts the benefits of even those who have a legitimate worker's disability. [1981 House Journal 2855.]

Reps. Emerson and Vanek protested, "This provision that has been adopted will increase the likelihood that an injured employee could receive no worker's compensation benefit, hardly an incentive for employers of this state to maintain a safe workplace." *Id.* Rep. Kelsey stated:

Additionally, I supported the revisions of the system during the fall of 1980, which will take effect in January, 1982. To my dismay, however, the commitment to only do away with the abuses

was not kept and it was decided by the proponents of revision to go all the way and not only to take care of the abuses but, again, to abuse and deprive the legitimate victims of on-the-job injuries. It was proposed not only to reduce the length of benefits but also the amount of benefits received by the workers. . . . I could not, in good conscience, support the so-called revision *which would only add to the current economic depression* and harm the citizens of the State of Michigan. [*Id.* at 2856. Emphasis added.]

Finally, Rep. Elliott added:

This package tonight will relieve many employers of their responsibilities to pay any worker's compensation benefits, *not only to older workers* but also to younger workers whose families may be entitled to social security benefits. [*Id.* Emphasis added.]

The 1981 Legislature knew exactly the consequences of SB 595. The purpose of the bill was to effectuate a cost saving reform for business, and to eliminate duplicate recovery of benefits. While some legislators strongly opposed 1981 PA 203, the majority felt the need for economic reform outweighed the "burden"[8] that may be felt by an injured worker receiving benefits from more than one source. Four years later, this Court upheld the clear legislative intent behind 1981 PA 203 when we *unanimously* held "that this statute clearly and unambiguously requires coördination of workers' compensation and other specified benefits for all compensable periods subsequent to its effective date, regardless of when the injury occurred."

[8] I quote the word "burden" because the effect of the coördination of benefits is that an injured employee will receive benefits in an amount equal to what he is entitled, but nothing extra by way of duplicate benefits.

*Chambers, supra* at 651. However, the 1987 Legislature not only disregarded our *Chambers* decision as having been "erroneously rendered," it also ignored the legislative history that served as the basis for the *Chambers* decision.

### B. 1987 PA 28

1987 PA 28 claims that the legislative intent of § 354 of 1981 PA 203 was "not to coordinate payments under this section . . . for personal injuries occurring before March 31, 1982." However, a review of the voting members of the 1987 Legislature indicates that this claim is impossible to sustain.

The 1987 amendment of § 354 was enacted in May 1987. At this time, Michigan was enjoying a much improved economic climate.[9] The level of unemployment was 8.2 percent[10] (down from the 1981 level of 14.4 percent), and the 1987 inflation rate for the City of Detroit was 3.0 percent[11] (down from the 1981 level of 9.3 percent). With Michigan industry in a much improved condition, and with a new Governor, the 1987 Legislature revisited the work of the 1981 Legislature.

The 1987 Legislature was displeased with the decision of this Court in *Chambers,* so it sought to correct our "erroneous" decision by providing its own "interpretation" of the intent of the 1981 Legislature. However, as pointed out by the appellants, only a fraction of the senators and represen-

[9] Perhaps the reforms of the Workers' Disability Compensation Act that were enacted in 1981 served their intended purpose of helping Michigan businesses return to economic health.

[10] MESC Report No. 3221 (1987). Provided by the Business Research Office, Michigan Department of Commerce.

[11] 1987 Consumer Price Index. Provided by the Business Research Office, Michigan Department of Commerce. Detroit is the only Michigan city for which the United States Bureau of Labor Statistics computes the inflation rate. See n 4.

tatives who voted in favor of 1981 PA 203 were still around to "interpret" the 1981 legislative intent with 1987 PA 28. Specifically, only eleven of the twenty-six senators[12] who voted in favor of 1981 PA 203 were still around to vote in favor of 1987 PA 28.[13] Similarly, only twenty of the sixty-two representatives[14] who voted in favor of 1981 PA 203 were around to vote in favor of 1987 PA 28.[15] Therefore, even though *less than half of the senators and less than one-third of the representatives from the 1981 Legislature* who voted in favor of 1981 PA 203 also voted in favor of 1987 PA 28, the 1987 Legislature claims that its amendment was the original intent of the 1981 Legislature. This is a claim with which I can not agree.

Furthermore, the claim of the 1987 Legislature that it provided the original intent of the 1981 Legislature flies in the face of the fact that those members of the 1981 Legislature who opposed 1981 PA 203 failed in their attempt to limit its application. As pointed out in *Chambers, supra* at 659, a legislative resolution[16] was passed after the enactment of § 354 which attempted to prevent the coördination of benefits of persons injured prior to its effective date. This Court first noted that the resolution was an attempt by those who opposed 1981 PA 203 to subsequently limit its scope and then held:

---

[12] Senators Arthurhultz, DeGrow, DiNello, Faust, Fredricks, Gast, Geake, Irwin, Miller, Sederburg, and Welborn.

[13] The Senate vote in favor of 1987 PA 28 was 35 yeas, one nay, and two excused. 1987 Senate Journal 1232.

[14] Representatives Alley, Brotherton, Bryant, Dunaskiss, Dutko, Giese, Gilmer, Gnodtke, Griffin, Hillegonds, Johnson, Knight, Maynard, Ostling, Randall, Stacey, Stopczynski, Strand, Trim, and Van Singel. 1987 House Journal 1232.

[15] The House vote in favor of 1987 PA 28 was 95 yeas, zero nay. *Id.*

[16] Senate Concurrent Resolution No. 575 adopted by the Senate on April 1, 1982, 1982 Senate Journal 626, 706; adopted by the House on May 18, 1982, 1982 House Journal 1262.

Had the Legislature wanted to change § 354 to impose that limitation, it could have properly done so only by amendment. Although § 354 has been amended, such amendments have not limited its application with respect to date of injury. Finally, the respectful consideration to which legislative resolutions are entitled . . . is offset here by the fact that a bill introduced to achieve that result was defeated [SB 834, introduced on May 20, 1982]. [*Id.*]

In sum, the economic and political climate surrounding the enactment of 1987 PA 28 was vastly different from that in 1981. Only thirty-five percent of those members of the 1981 Legislature who voted in favor of 1981 PA 203 also voted in favor the 1987 amendment. Also, the legislative history of 1981 PA 203 clearly contradicts the claim of the 1987 Legislature that 1987 PA 28 provided the original intent of the 1981 Legislature.

Through this scenario, the wisdom of the *Presque Isle Twp School Dist,* rule becomes evident—a legislative body is not permitted to declare what its intention was on a former occasion so as to affect past transactions. Therefore, I would conclude that the claim of the 1987 Legislature is nugatory.[17]

## II. REMEDIAL LEGISLATION v SUBSTANTIVE CHANGE

The 1987 Legislature described 1987 PA 28 as a "remedial and curative amendment," § 354(17). This is a description with which the Court of

---

[17] At the very least, just as the 1987 Legislature felt that our decision in *Franks, supra,* was erroneous, it is equally plausible that the interpretation imputed to the 1981 Legislature by the 1987 Legislature was erroneous.

Appeals agreed.[18] I do not share the same opinion.

The function of curative legislation is to "repair the consequences of legal accident or mistake." 2 Sands, Sutherland Statutory Construction (4th ed), § 41.01, p 338. A legal accident or mistake "can be the result of the failure of the lawmakers to make provision for unforeseen circumstances which should have been provided for or the failure of parties to conform to nonessential legal requirements or limitations." *Id.*

The case before us today is not one of "legal accident or mistake." Quite the opposite is true. 1981 PA 203 was enacted at the conclusion of a comprehensive reform of the Workers' Disability Compensation Act. The Legislature had made the determination that the system was subject to abuse by employees who were receiving benefits from multiple sources. In turn, this would result in the employee receiving total benefits that were in excess of his workplace compensation. In order to eliminate this possibility, and to reduce the cost of workers' compensation to businesses, the coördination of benefits provision was enacted.

There was no "failure . . . to make provisions for unforseen circumstances." The Legislature enacted a statute that gave employers the right to coördinate benefits beginning on March 31, 1982. On October 7, 1985, this Court unanimously interpreted the statute to mean that employers have the right to coördinate benefit payments regardless of the date of injury. Consequently, after having the matter resolved by the highest court in the state, General Motors and Ford had the unquestionable right to coördinate the benefits of all employees receiving workers' compensation bene-

---

[18] *Romein v General Motors Corp,* 168 Mich App 444, 455; 425 NW2d 174 (1988).

fits who came under the provisions of 1981 PA 203.

Yet, nearly two years after the *Chambers* decision, and more than five years after the enactment of 1981 PA 203, the 1987 Legislature declared that General Motors and Ford did not have the right to coördinate benefits. Furthermore, § 354(19) of 1987 PA 28, required any amount so coördinated (pursuant to the statutory right as interpreted in *Chambers*), to be reimbursed *with interest*.

For a number of years, General Motors and Ford were coördinating benefit payments pursuant to their statutory right. At the very least, the companies were acting within the spirit of the law. Yet, this right was retroactively revoked by "remedial" legislation. Also, the "curative" legislation imposed upon the companies the added obligation of interest. Finally, 1987 PA 28 was enacted to invalidate this Court's decision is *Chambers,* thus effecting a substantive change in the law. *Hurd v Ford Motor Co,* 423 Mich 531, 534; 377 NW2d 300 (1985).

"[T]he word of the 'curing' legislature should not be conclusive in determining what the prior representatives meant. The question of original intent is ultimately one for the reviewing court." Eule, *Temporal limits on the legislative mandate: Entrenchment and retroactivity,* 1987 Am B Found Res J 379, 448. This Court had interpreted the original intent of the 1981 Legislature. Yet, our interpretation was rejected by the 1987 Legislature. Therefore, I can not agree that the 1987 amendment was "remedial and curative." Rather, I would hold that the 1987 amendment amounted to a substantive change in the law.[19]

---

[19] In fact, the language found in § 354(17) was added in an admitted attempt to "cure the [constitutional] defect." Statement of Sen.

### III. CONSTITUTIONAL ANALYSIS

#### A

The majority holds, "[t]he operative provisions of the statute do not encroach upon the sphere of the judiciary. Rather, they merely repeal the act that *Chambers* construed." *Ante,* p 537. However, this argument fails when reviewed against well-settled Michigan case law and the rules of statutory construction.

In *Wade v Farrell,* 270 Mich 562, 567; 259 NW 326 (1935), this Court unanimously[20] held:

> "When a statute continues a former statute law, that law common to both acts dates from its first adoption, and only such provisions of the old act as are left out of the new one are gone, and *only new provisions are new laws. Where an act is amended . . . the part of the original act which remains unchanged is considered as having continued in force as the law from the time of its original enactment* and the new portion as having become the law only at the time of the amendment." 25 RCL p 907.[21] [Emphasis added.]

The rule quoted in *Wade,* mirrors the rule enunciated in 1A Sands, Sutherland Statutory Construction (4th ed), § 22.33, pp 287-288:

> Provisions of the original act or section which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law. This rule of interpretation is applicable even though the original

DeGrow after the Senate voted in favor of SB 67 (1987 PA 28), 1987 Senate Journal 1235-1236. See text, *post,* pp 560-561.

[20] The opinion was signed by the six justices who participated, Chief Justice POTTER and Justices FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE. Justice NELSON SHARPE did not sit.

[21] See also *Perry v Hogarth,* 261 Mich 526, 530; 246 NW 214 (1933).

act or section is expressly declared to be repealed.
. . . *The provisions of the original act or section
reenacted by the amendment are held to have
been the law since they were first enacted,* and the
provisions introduced by the amendment are con-
sidered to have been enacted at the time the
amendment took effect. Thus, rights and liabilities
accrued under the provisions of the original act
which are reenacted are not affected by the
amendment. [Emphasis added.]

Our decision in *Chambers* interpreted the coör-
dination of benefits provisions as pertaining to all
benefit payments due after March 31, 1982, re-
gardless of the date of injury. The majority claims
that the 1987 PA 28 "repeal[ed] the act that
*Chambers* construed." However, 1987 PA 28
adopted verbatim the language of the first fifteen
sections of the original act, MCL 418.354(1)-(15);
MSA 17.237(354)(1)-(15), and it is within these first
fifteen sections that the coördination of benefits
provisions are found.

Applying both Michigan law and the rules of
statutory construction to the instant matter leads
to the conclusion that the coördination of benefits
provisions that were interpreted by this Court in
*Chambers* were not repealed. Rather, because they
were reenacted by adopting the identical language
from the original act, the coördination of benefits
provisions are " 'considered as having continued in
force as the law from the time of [their] original
enactment [March 31, 1982].' " *Wade, supra* at 567.

B

Thus, I am persuaded that the declaration made
by the 1987 Legislature in 1987 PA 28, § 354(17)
that it was providing the legislative intent of the
1981 Legislature is clearly not supported by the

economic, political, and legislative history behind
the enactment of each amendment at issue here,
1987 PA 28 and 1981 PA 203. Moreover, it violates
Michigan case law, *Presque Isle Twp Bd of Ed,
supra.* The amendment enacted by the 1987 Legis-
lature was not "remedial and curative." Rather, it
was a substantive change in the law. Finally, 1987
PA 28 did not repeal the legislative provisions that
we interpreted in *Chambers.*

Therefore, the remaining question is, "What is
the net effect of 1987 PA 28, and is the amend-
ment constitutional?"

In my opinion, the net effect of 1987 PA 28 was
nothing more than an attempt to "overrule" the
decision of this Court in *Chambers,* to render the
*Chambers* opinion null and void, as if it was never
released.[22] This Court cannot surrender to this
invasion into the constitutionally granted author-
ity of the judicial branch.

It should come as no surprise to the Legislature
that 1987 PA 28 was constitutionally defective.
After SB 67 (1987 PA 28) was passed, Sen.
DeGrow[23] commented:

Additionally, we've put in language that I think
strengthens the argument that what we've done
with the *Chambers* decision is constitutional. *We
put it in a preceding paragraph that tells what the*

---

[22] After the 1987 Senate voted to pass SB 67 (1987 PA 28), Sen.
Cherry, a member of the conference committee that prepared the bill,
stated, "Additionally, I am pleased that the language in Section 354
will finally correct the gross injustice done by the Supreme Court's
*Chambers* decision. It is a disgrace that has taken four years for the
Legislature to act to rectify this situation which portrays a promise to
many older workers." 1987 Senate Journal 1234-1235.

Query: Was the "gross injustice," as perceived by Sen. Cherry, a
result of this Court's decision, or was it a result of the statutory
language passed by the 1981 Legislature which this Court is duty
bound to interpret?

[23] Sen. DeGrow was a senate conferee for the Conference Report
regarding 1987 PA 28. 1987 Senate Journal 1232.

*intent of the Legislature was and will make
stronger the argument that we haven't passed an
unconstitutional act. I'm not sure it will cure the
defect,* but I think we can feel a little better about
ourselves in terms of voting for it; that it is not
something that is unconstitutional. [1987 Senate
Journal 1236. Emphasis added.]

In his article, Professor Julian N. Eule notes,
*supra* at 445:

The voters do not delegate authority to rewrite
history. Their earlier agents exercised legitimate
authority when they enacted legislation. While
such efforts may be repealed, this is not the same
as retrospective eradication. A decision that bills
defeated by prior legislatures can now be enacted
and treated as if they *had* been enacted earlier
arguably runs afoul of this same principle.[24] The
then-authorized representatives made a choice,
and this decision demands recognition as the
choice of the polity for that point in time. Each set
of elected officials ought to be viewed as endowed
by their sovereign with the mandate to make
policy choices only within a bracketed temporal
zone. Just as the delegation of authority does not
encompass incursions into the domain of legisla-
tures yet to come, it does not contemplate contra-
vening the sanctity of time past. [Emphasis sup-
plied.]

In *Bankers Trust Co of Detroit v Russell,* 263
Mich 677, 684; 249 NW 27 (1933), this Court
reiterated the rule that to declare what the law
shall be is a legislative power, and to declare what
the law is, or has been, is a judicial power. The
Court went on to hold, "[the Legislature] may not

[24] Keep in mind that a bill, introduced in an attempt to limit the
application of the coördination of benefits provisions, was defeated. SB
834, introduced on May 20, 1982. See text, *supra* at 555.

by statute attempt to exercise judicial power by construing a statute for the court." *Id.*[25]

The members of the 1981 Legislature were the "then-authorized representatives" who made their decisions based on the demands of the time. In 1981, they declared what the law "shall be" with regard to the coördination of benefit payments. In 1985, this Court interpreted what the "meaning" of the law was. Subsequently, the 1987 Legislature attempted to exercise judicial power by "rewrit-[ing] history" in order to retroactively construe the statute for this Court, the effect of which was to eradicate the 1981 legislation. I find this to be an unconstitutional encroachment upon the judiciary.

In speaking about the problem of retroactivity, Justice Holmes once remarked, "[p]erhaps the reasoning of the cases has not always been as sound as the instinct which directed the decisions." *Danforth v Groton Water Co,* 178 Mass 472, 476; 59 NE 1033; 86 Am St Rep 495 (1901). Perhaps this is the case here. In any event, I believe that the circumstances surrounding the retroactive enactment of 1987 PA 28 evidence a particularly egregious intrusion upon the separation of powers and the "one court of justice" articles of the Michigan Constitution.[26]

---

[25] Analogous to the current matter, in *Bankers Trust Co,* the Legislature attempted to retroactively construe the term "trust mortgage" as used in 1929 CL 13498, 13499. The purpose behind the amendment was to assist owners of property and securities who had liens placed upon them as a result of the depression. Addressing the plight of the individuals adversely affected, the Court held, "Conflicting interests are involved in these cases, and *the court can but construe the statute in question as it reads, and not as equitable considerations might impel us to do." Bankers Trust Co, supra* at 684-685. (Emphasis added.)

[26] In his concurrence, Justice BRICKLEY writes that while he is "[t]roubled" by the 1987 amendment, he must concur with the majority because of the failure of the United States Supreme Court to "articulate any discernible limits on the constitutionality of retroactive . . . legislation . . . ." *Ante,* p 540.

### IV. CONCLUSION

I am not yet prepared to accept the "slippery slope" argument that unless the Court acts now, the Legislature will usurp all of the constitutional authority granted to the judiciary. However, the Michigan Constitution of 1963 mandates the separation of powers between the three branches of government, art 3, § 2, and declares that the judicial power of the state is vested in "one court of justice," art 6, § 1.

Throughout history, courts of last resort have been called upon to make difficult decisions that may have run contrary to popular opinion. These decisions have included, but are certainly not limited to, issues involving criminal matters, civil rights, and economic legislation. It is necessary to have an equally powerful judicial branch of government in order to ensure that the balance of power is not weighted in favor of the Legislature, and to ensure that individual rights are not circumvented by the will of the majority. Therefore, in order for this Court to maintain its equal position within our tripartite system of government, we must secure our constitutionally granted authority.

While it is understandable that emotions may run in favor of an injured employee and against a large corporation, this Court "can but construe the statute in question as it reads, and not as equitable considerations might impel us to do." *Bankers Trust Co, supra* at 684-685. See n 25. In *Chambers,*

I note that the argument advanced by the appellants, as well as my dissent are based on the Michigan Constitution of 1963. Therefore, the lack of United States Supreme Court guidance is not fatal to the appeal.

Furthermore, only in a parliamentarian system of government is the judiciary subject to a superior legislature. In our republican system, the judicial branch is the equal of legislative branch.

we unanimously interpreted the intent of the 1981 Legislature when it enacted 1981 PA 203. In 1987, the Legislature "overruled" our decision.

Therefore, I would hold that the 1987 Legislature ran afoul of the separation of powers and the one court of justice articles of the Michigan Constitution when it gave retroactive effect to 1987 PA 28.

Accordingly, I would reverse the decision of the Court of Appeals and apply the amendment prospectively from the date of its enactment, May 14, 1987.

GRIFFIN, J. (*dissenting*). While I agree with the Chief Justice that 1987 PA 28 violates Michigan's constitutional requirement of separation of powers,[1] I write separately to register my strong view that the enactment also contravenes the United States Constitution's Fourteenth Amendment due process guarantee.

I

In 1985, this Court unanimously held in *Chambers v General Motors Corp*, 422 Mich 636, 651; 375 NW2d 715 (1985), that § 354 of 1981 PA 203, which became effective March 31, 1982, "clearly and unambiguously" permitted coördination, after its effective date, of certain employer-financed benefits, regardless of the date of injury.

A subsequent Legislature passed 1987 PA 28, which amended § 354[2] by reenacting the section's original language verbatim and adding four new subsections, MCL 418.354(17)-(20); MSA 17.237(354)(17)-(20). These amendments were made effective

[1] Const 1963, art 3, § 2 and art 4, § 1.
[2] 1987 PA 28.

May 14, 1987. Section 354(17) expressly states the purpose of the legislation:

> The decision of the Michigan Supreme Court in *Franks v White Pine Copper Division,* 422 Mich 636 (1985) *is declared to have been erroneously rendered* insofar as it interprets this section, it having been and being the legislative intention not to coordinate payments under this section resulting from liability pursuant to section 351, 361, or 835 for personal injuries occurring before March 31, 1982. *It is the purpose of this amendatory act* to so affirm. This remedial and curative amendment shall be liberally construed to effectuate this purpose. [Emphasis added.]

Section 354(19) provides that any coördination prior to the act's effective date "shall be considered to be an underpayment of compensation benefits, and the amounts withheld pursuant to coordination shall be reimbursed with interest . . . ."

Thus, the 1987 amendment of § 354 was enacted not only for the declared purpose of reversing this Court's decision in *Chambers, supra,* but also to impose retroactively upon employers a substantial increase in liability for compensable periods *prior* to the act's effective date.

II

It is fundamental that this Court, not the 1987 Legislature, is entrusted by the constitution with the power to determine the meaning of the 1981 statute. *Webster v Rotary Electric Steel Co,* 321 Mich 526, 531; 33 NW2d 69 (1948) (the proper construction of a statute is a judicial function); *Bankers Trust Co of Detroit v Russell,* 263 Mich 677; 249 NW 27 (1933) (the Legislature may not exercise judicial power by construing a statute). In the past, we have declared:

"It is too elementary to justify us in referring to authority on the question, that a legislative body is not permitted under any circumstances to declare what its intention was on a former occasion so as to affect past transactions. . . . Its members have no more right to construe one of its enactments retroactively than has any private individual." [*Presque Isle Twp Bd of Ed v Presque Isle Co Bd of Ed,* 364 Mich 605, 612; 111 NW2d 853 (1961) (quoting *Northern Trust Co v Snyder,* 113 Wis 516, 530; 89 NW 460 [1902]).]

Article 3, § 2 of the Michigan Constitution provides: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

This Court has said: " 'To declare what the law shall be is legislative; to declare what it is or has been is judicial.' " *In re Manufacturer's Freight Forwarding Co,* 294 Mich 57, 63; 292 NW 678 (1940) (quoting *In re Application of Consolidated Freight Co,* 265 Mich 340, 343; 251 NW 431 [1933] [POTTER, J., dissenting]). The Legislature, by enacting 1987 PA 28, not only declared what the law "shall be," but purported to declare what the intent of a prior Legislature "was."

Like other members of this Court, I am "troubled" by the Legislature's wording of § 354(17). I would go a step further, however, and state what should be obvious: the declaration by the 1987 Legislature concerning the intent of the 1981 Legislature is a nullity.

III

Many years ago another court explained why

the policy against retroactivity is a fundamental principle of justice which limits legislative power:

> Our constitutions do not admit the power assumed by the *Roman* prince; and the principle we are considering is now to be regarded as sacred. It is not pretended that we have any express constitutional provision on the subject; nor have we any for numerous other rights dear alike to freedom and to justice. An *ex post facto* law, in the strict technical sense of the term, is usually understood to apply to criminal cases, and this is its meaning, when used in the constitution of the *United States;* yet laws impairing previously acquired *civil* rights are equally within the reason of that prohibition, and equally to be condemned. . . . [T]here is no distinction in principle, nor any recognized in practice, between a law punishing a person criminally, for a past innocent act, or punishing him civilly by divesting him of a lawfully acquired right. The distinction consists only in the degree of the oppression . . . . [*Dash v Van Kleeck,* 7 Johns 477, 505-506 (NY, 1811). Emphasis in original.]

The fundamental distrust of retroactive laws has found expression in our rules of statutory interpretation which favor prospective application. De-Mars, *Retrospectivity and retroactivity of civil legislation reconsidered,* 10 Ohio N U L R 253, 259 (1983). Moreover, because "[r]etroactive legislation has always been looked upon with disfavor . . . even its constitutionality has been conditioned upon a rationality requirement *beyond that applied to other legislation.*" *Bowen v Georgetown Univ Hosp,* 488 US 204, 223; 109 S Ct 468; 102 L Ed 2d 493 (1988) (Scalia, J., concurring, emphasis added, citations omitted).

As the majority concedes, the retroactive aspects of 1987 PA 28 are different from those which were found constitutional by the United States Supreme

Court in *Pension Benefit Guaranty Corp v R A Gray & Co,* 467 US 717; 104 S Ct 2709; 81 L Ed 2d 601 (1984), and *Usery v Turner Elkhorn Mining Co,* 428 US 1; 96 S Ct 2882; 49 L Ed 2d 752 (1976). The differences are materially significant. Legislation scrutinized in those cases does not compare to the enactment here which was deliberately designed to disrupt retroactively past transactions completed in reliance upon this Court's specific holding in *Chambers* that all workers' compensation payments were subject to § 354 coördination regardless of the date of injury.

In *R A Gray & Co,* the retroactive application of the legislation was restricted to a short five-month period preceding the statute's effective date. This retroactivity, according to the Court, was necessary in order to provide Congress time to legislate without a governmental agency suffering severe economic consequences resulting from employers withdrawing from multiemployer pension plans. In affirming the constitutionality of the legislation, the Court explicitly noted that,

> the enactment of retroactive statutes "confined to *short and limited periods* required by the practicalities of producing national legislation . . . is a customary congressional practice." We are loathe to reject such a common practice when conducting the limited judicial review accorded economic legislation . . . . [467 US 731. Emphasis added, citation omitted.]

Moreover, the Court cautioned that,

> retroactive legislation *does* have to meet a burden *not* faced by legislation that has only future effects. "It does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as

well as the prospective aspects, must meet the test of due process, *and the justifications for the latter may not suffice for the former.*" [*Id.* at 730. Emphasis added.]

In *Usery,* Congress enacted legislation requiring, inter alia, coal mine operators to compensate employees for black lung disease contracted during employment which had been terminated long before the effective date of the statute. In finding that the retroactive aspect of the legislation passed constitutional muster, the Supreme Court stated:

> To be sure, insofar as the Act requires compensation for disabilities bred during employment terminated before the date of enactment, the Act has *some* retrospective effect—*although, as we have noted, the Act imposed no liability on operators until 1974. . . .* [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . *This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.* [428 US 15-16. Emphasis added.]

Justification for such retroactive legislation can be found in the fact that black lung disease develops over a long period of time and its symptoms, in many instances, do not become apparent until after termination of employment. *Usery, supra* at 7-8. No analogous justification appears in this case to justify undoing completed transactions.

More fundamentally, neither Congress nor the United States Supreme Court had affirmatively spoken on the issue of a coal mine operator's responsibility for black lung disease prior to enactment of the legislation considered in *Usery.* There the Supreme Court specifically recognized that the aggrieved party's reliance upon the prior state of

the law is a factor in determining whether retroactive application of a statute can be legitimate. 428 US 17. It is one thing, however, to "rely" on the absence of law, and quite another to rely on an affirmative statement of the law as enacted by the Legislature and construed by the state's court of last resort.

It should be stressed that, prior to the majority's decision today, this Court never recognized or sanctioned a legislative attempt to overrule retroactively a decision of this Court.[3] Nor has the United States Supreme Court given consideration to the effect of retroactive legislation upon conduct occurring after judicial interpretation but before the "overruling" legislation was enacted. However, one commentator noted the implications when he wrote, "Prima facie, this would seem to form a distinct problem, since such conduct would apparently be patterned after the first judicial interpretation and therefore unjustly undercut by the legislation . . . ." Slawson, *Constitutional and legislative considerations in retroactive lawmaking*, 48 Cal L R 216, 249 (1960). Where a particular individual can "prove he had in fact relied on the interim state of the law to his detriment . . . it seems clear that he should be entitled to relief." *Id.*

The reliance by appellants on our decision in *Franks* was substantial. It appears that their increased liability by virtue of the majority's decision today, without reference to its effect upon other employers, will exceed $22 million. I do not agree with the majority's position that the reliance

---

[3] Of course, no question is raised concerning the Legislature's power to enact legislation which may have the effect *prospectively* of overruling a decision of this Court. See, e.g., *Hurd v Ford Motor Co,* 423 Mich 531; 377 NW2d 300 (1985) (enactment intended to overrule *Deziel v Difco Laboratories, Inc (After Remand),* 403 Mich 1; 268 NW2d 1 (1978) (has prospective effect).

interest of appellants is inconsequential because it was not reduced to judgment. Such an assertion ignores the fact that appellants had no reason to seek a judgment. As we ruled in *Franks, supra,* the 1981 statute permitted employers to coördinate benefits without institution of any type of proceedings. 422 Mich 661.[4]

---

[4] To be sure, this Court has, on occasion, upheld the validity of retroactive legislation. However, a distinction must be drawn between legislation that modifies benefits and liabilities prospectively based on prior conduct, and that which alters completed transactions. We recognized the distinction in *Franks.* While construing the original version of § 354, the Court said,

> We . . . disagree with the board's assumption that application of the coordination of benefits provision of § 354 to work-ers' compensation payments for compensable periods *after the effective date of the statute* would constitute retrospective application simply because the liability is based upon an injury that occurred *prior* thereto. As the board accurately observed . . . "it is not contended that compensation benefits should be retroactively coordinated or reduced. Rather it is argued that the benefits of *all* disabled workers should be *prospectively* coordinated after the effective date of the enactment *regardless of when they were injured.*" [422 Mich 652-653. First emphasis added, later emphasis in original, citation omitted.]

In contrast to a statute like original § 354 which prospectively altered benefit levels based on a past injury, this Court noted that § 358 of 1980 PA 357 appeared to be "purely" retroactive. That section provided:

> Net weekly benefits payable under section 351, 361, or lump sum benefits under section 835, shall be reduced by 100% of the amount of benefits paid or payable to the injured employee under the Michigan employment security act, Act No. 1 of the Public Acts of the Extra Session of 1936, as amended, being sections 421.1 to 421.67a of the Michigan Compiled Laws, for identical periods of time and chargeable to the same employer.

In determining whether § 354 was intended to operate retroactively, we said:

> Although a statute is not regarded as operating retrospectively merely because it relates to an antecedent event, as we have already observed, application of the provisions of § 358 to impose a disability, in the form of a setoff, upon the amount of

I agree with the majority that "[t]he Legislature possesses the authority to enact workers' compensation laws that ' "increase the burden on the employer for disability or expenses *occurring or continuing after the date of enactment* of the amendatory statute, even though the accident which gave rise to the disability or expenses had occurred prior to that time." ' " *Ante,* p 531 (quoting *Lahti v Fosterling,* 357 Mich 578, 592; 99 NW2d 490 [1959] [emphasis added]). Unlike the majority, however, I would emphasize the word "after." Our past cases have limited the retroactive effect of such legislation by applying a change in benefit levels to those payments due *after* the effective date of an enactment. See *Lahti, supra* (amendment eliminating twenty-four-month limit on employer's liability for medical care could be retroactively applied to the extent that employers required to provide extended medical care to worker *after* the amendment's effective date notwithstanding that the injury occurred *before* the effective date), *McAvoy v H B Sherman Co,* 401 Mich 419; 258 NW2d 414 (1977) (the statute prohibiting a stay of seventy percent of benefits pending appeal of the referee's decision awarding compensation only applies to those benefits accruing *after* the statute's effective date), *Selk v Detroit Plastic Products,* 419 Mich 1; 345 NW2d 184 (1984) (under statute increasing interest on workers' compensation award, where benefit payment is made *after* the effective date of the statute, interest is to be computed at twelve percent from the date the

workers' compensation time periods *prior to the effective date of the legislation in question,* is purely retroactive. [422 Mich 671. Emphasis added.]

This Court held that because § 358 was not merely procedural or remedial, and since it affected the substantive right of workers to receipt of payments existing prior to the statute's effective date, the statute was not to be applied retrospectively. 422 Mich 673.

payment was due), *Franks, supra* (statute permitting coördination of benefits is *prospectively* coördinated *after* the effective date of the enactment regardless of when the employee was injured).

The majority concedes that the appellants' "reliance on the preëxisting state of the law should be considered" in determining whether retroactive legislation is constitutional. *Ante,* p 530. However, the majority then asserts that appellants' reliance was not reasonable because the preëxisting law was in "a state of flux." *Ante,* p 531. I disagree. After the Legislature enacts a statute which, according to this Court, "clearly and unambiguously" permits coördination of benefits without regard to date of injury, the law is not in a "state of flux." Given that this Court has never before recognized legislation purporting to overrule retroactively a decision by this Court interpreting the enactment of a prior Legislature, it could hardly be said that these appellants were on notice that the law might be changed in such a manner. Under the majority's analysis, the appellants apparently had no right to rely upon either the 1981 legislation or this Court's decision in *Franks.* Presumably, if the majority's analysis were correct, no employer or employee in this state would have the right to rely now upon 1987 PA 28 since the Legislature may change it retrospectively in its entirety tomorrow, next week, or next year.

As a matter of common sense, a citizen's reliance upon a statute as a statement of the law reasonably increases once the state's highest court interprets and declares what the statute means. To be sure, an individual can have no legitimate expectation that such a statute will not be subsequently changed prospectively; yet, it has been considered reasonable, at least until the majority's decision today, to expect that a statute will not be

altered so as to reopen and significantly alter past transactions which have been completed in reliance upon the statute and its interpretation by the Court.

To dismiss, as the majority does, the argument of appellants that they justifiably relied on this Court's ruling in *Chambers* with the shibboleth that one may not expect that a socioeconomic law will not be retroactively changed, is to ignore the bounds of reason and fairness. As pointed out by Sutherland,

> Analysis of the practical considerations influencing the question whether a retroactive application of a new law is fair and just should afford more meaningful standards of judgment than either catchpenny phrases or the ambivalent concept of "vested." . . .
>
> One of the fundamental considerations of fairness recognized in every legal system is that settled expectations honestly arrived at with respect to substantial interests ought not be defeated. [2 Sands, Sutherland Statutory Construction (4th ed), § 41.05, pp 365-366.]

Taking the majority's analysis to its logical conclusion would permit the Legislature to overrule decades-old decisions of this Court and impose retroactive liability for completed transactions conducted in accordance with those decisions, subject only to the nebulous requirement that the legislation is supported by any "legitimate legislative purpose." In order to protect this Court's status as the final arbiter of what the law is, and to secure the guarantee of due process, I would hold that the Legislature may not retroactively undo past transactions completed in reliance upon a decision of this Court.

Accordingly, I would reverse the decision of the Court of Appeals.